IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DENORA L. MORFORD,                                         Case No. 6:15-cv-01216-SB

        Plaintiff,                                                **OPINION AND**
                                                                              **ORDER**

    v.

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.

_____

**BECKERMAN, Magistrate Judge.**

    Denora Morford ("Morford") brings this appeal challenging the Commissioner of Social

Security's ("Commissioner") denial of her application for Supplemental Security Income under Title

XVI of the Social Security Act, 42 U.S.C. § 1381-83f. The Court has jurisdiction to hear this appeal

pursuant to 42 U.S.C. § 1383(c)(3), which incorporates the review provisions of 42 U.S.C. § 405(g).

For the reasons that follow, the Court affirms the Commissioner's denial of Morford's application

for benefits.

Page 1 - OPINION AND ORDER

## I. FACTS AND PROCEDURAL HISTORY

Morford was born in February 1973, making her thirty-nine years old on April 26, 2012, the amended alleged disability onset date.[1] Morford has a high school education and completed some college coursework in criminal justice at Linn-Benton Community College in Albany, Oregon. Morford has no past relevant work experience. In her application for Supplemental Security Income, filed on April 26, 2012, Morford alleges disability due primarily to headaches, spells of dizziness and faintness, and asthma.

On January 10, 2011, a little over a year before the amended alleged disability onset date, Morford began a four-day epilepsy monitoring study based on reports of daily blackouts, twitching, fainting, and seizures. Electroencephalogram ("EEG") and electrocardiogram ("EKG") tests showed no significant abnormalities, and it was determined that Morford's episodes were related to stress. (Tr. 348.)

On March 23, 2011, Morford visited the emergency room department at Good Samaritan Regional Medical Center, complaining of a syncopal episode. Diagnostic studies again proved to be unremarkable.[2]

---

[1] Morford previously applied for disability benefits in December 2002, March 2005, and April 2011. Morford's prior applications were denied at the administrative level, and she did not appeal to federal court.

[2] The record indicates that Morford has visited medical providers on a number of occasions, complaining of passing out and twitching. All subsequent test results were found to be normal. (*See* Tr. 353, "She has had extensive evaluation for [syncopal episodes] including inpatient monitoring, EEGs, neuro consult and now a Holter study . . . all of which have been unrevealing"; Tr. 380, "Has recently been evaluated through neurology for possible seizures. EEG and all testing has been completely normal"; Tr. 491, "She says she has had several scans and a Holter monitor and lots of lab tests and all of the results are normal. She even has had four days of video EEG monitoring that was normal.")

On June 20, 2011, Morford presented for her second consultation with Dr. Jon Sobotka ("Dr. Sobotka"). Morford reported that she continued to experience spells of dizziness, she was working between eight to twelve hours per week at K-Mart, and the "job has been helpful for not only extra money, but giving her a sense of purpose and she feels successful at it." (Tr. 489.) Morford also reported that her employer had been informed that these episodes of dizziness "are not caused by major medical problems and do not pose a risk of causing major medical problems . . . , but she could be able to recuperate at work and resume her duties if they would allow her to do so." (Tr. 489.) Dr. Sobotka advised Morford to continue taking psychotropic medication for schizoaffective and conversion disorders, and made "[a]n effort" to help Morford "see the benefits of working[.]" (Tr. 490.)

On December 8, 2011, Morford presented for an assessment at Benton Health Services in Corvallis, Oregon. On mental status exam, Judy Vogelsang ("Vogelsang"), a licensed clinical social worker, assessed a Global Assessment of Functioning ("GAF") score of 61, and noted that Morford demonstrated an "average" intellect and her memory was "grossly intact, [but] not formally tested."[3] (Tr. 575.)

On February 29, 2012, Morford presented for a consultation with Dr. Richard Lafrance ("Dr. Lafrance"). Morford reported that she had been attending counseling every other week at Benton County Mental Health, she had "not had any episodes of syncope or collapse," she felt "her spells are better because she is getting counseling," and a recent return to work had "gone well." (Tr. 513.)

---

[3] A GAF score of sixty-one to seventy indicates that the individual "generally functions pretty well," but does experience "mild symptoms" or "some difficulty" in regard to social, occupational, or school functioning. *Sims v. Barnhart*, 309 F.3d 424, 427 n.5 (7th Cir. 2002) (citation and brackets omitted).

Page 3 - OPINION AND ORDER

Dr. Lafrance noted that Morford's episodes were "in control - likely resolving conversion disorder." (Tr. 514.)

Morford returned to Vogelsang's office on March 11, 2012, and reported that "she has had no further fainting spells." (Tr. 582.) When Vogelsang sought an explanation for this improvement, Morford claimed the cessation of the episodes was due to "having someone to talk to about things." (Tr. 582.) On June 8, 2012, however, Morford informed Vogelsang that her fainting spells had returned.

On June 14, 2012, Morford was referred to Dr. Jill Spendal ("Dr. Spendal") for a cognitive and psychological assessment. Dr. Spendal's diagnoses were: social phobia and schizoaffective and conversion disorders (Axis I); borderline intellectual functioning (Axis II); pseudoseizures and carpal tunnel syndrome per client's report (Axis III); finances and unemployment (Axis IV); and a GAF score of 55 (Axis V).[4] Dr. Spendal also concluded that Morford "is unlikely to be able to work at a full-time level," because her "schizoaffective disorder and social phobia combined with borderline intellectual functioning will make it far more difficult for her to handle the stress and demands[.]" (Tr. 619.)

On June 20, 2012, Morford completed an adult function report in support of her application for benefits. Morford stated that her "illnesses, injuries, or conditions" limit her ability to work in the following way: "I pass out and can't speak or move."[5] (Tr. 223.) Morford also stated that she is

---

[4] "A GAF score of 55 indicates moderate symptomatology and difficulties in social, occupational, or school functioning." *Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 457 (6th Cir. 2012).

[5] According to Morford, she has lost consciousness on only one occasion during these self-reported "spells" of passing out. (Tr. 49.)

capable of preparing meals, caring for her daughter, handling her own personal care, driving, paying

bills, counting change, handling a savings account, using a checkbook, reading, watching television,

and cleaning, doing laundry, and shopping on a weekly basis. Morford added that her impairments

impact her ability to lift, bend, stand, walk (she needs to rest after walking one mile), and climb

stairs.

On June 28, 2012, Dr. Spendal completed a mental residual function capacity assessment,

which described Morford as moderately limited in twelve of twenty categories of mental activity,

markedly limited in three (the ability to travel in unfamiliar places or use public transportation, the

ability to maintain attention and concentration for an extended period, and the ability to "complete

a normal workday and workweek without interruptions from psychologically based symptoms and

to perform at a consistent pace without an unreasonable number and length of rest periods"), and not

significantly limited in five. (Tr. 621.) Dr. Spendal added that Morford has a borderline intelligence

quotient ("IQ").

Dr. Richard Winslow ("Dr. Winslow"), a non-examining state agency psychologist,

completed a psychiatric review technique assessment on July 16, 2012, wherein he evaluated

Morford's impairments under listings 12.02 (organic mental disorders), 12.04 (affective disorders),

12.06 (anxiety disorders), and 12.07 (somatoform disorders). Dr. Winslow reviewed the evidence

and concluded that the limitations imposed by Morford's impairments failed to satisfy the above

listings.

That same day (July 16, 2012), Dr. Winslow also completed a mental residual functional

capacity assessment, which described Morford as moderately limited in three of sixteen categories

of mental activity and not significantly limited in thirteen. Dr. Winslow added that Morford can

consistently maintain concentration, persistence, and pace "for simple tasks for normal [two] hour work periods," but she "cannot consistently complete more complex tasks," and that Morford should be limited to only occasional, brief interaction with the general public due to her psychological symptoms. (Tr. 82.)

Dr. Dorothy Anderson ("Dr. Anderson"), a non-examining state agency psychologist, completed a second psychiatric review technique assessment on December 6, 2012, wherein she evaluated Morford's impairments under listings 12.02, 12.04, 12.06, and 12.07. Dr. Anderson concluded that the limitations imposed by Morford's impairments failed to satisfy listings 12.02, 12.04, 12.06, or 12.07.

Also on December 6, 2012, Dr. Anderson completed a second mental residual functional capacity assessment, which described Morford as moderately limited in three of sixteen categories of mental activity and not significantly limited in thirteen. Dr. Anderson also concluded that (1) Morford "can consistently understand and remember short [one to two] step instructions," but she "cannot consistently remember more detailed instructions," and (2) Morford needs to be limited only to brief, occasional interaction with the general public due to her psychological symptoms. (Tr. 92-93.)

An administrative law judge ("ALJ") convened a hearing on November 21, 2013, at which Morford testified about the limitations resulting from her impairments. Morford testified that she suffers primarily from headaches, spells of dizziness, and asthma; she has a fifteen-year-old daughter whom she drives to and from school; she works four hours per week at K-Mart; her doctor recommends that she treat her headaches with Tylenol, which alleviates the pain at times; she is able

to cook, clean, and shop, but she tries to avoid groups of people; and she earned "pretty good" grades while attending Linn-Benton Community College and studying criminal justice. (Tr. 55.)

The ALJ posed a series of questions to a vocational expert ("VE"), who testified at Morford's hearing. The ALJ first asked the VE to assume that a hypothetical worker of Morford's age, education, and work experience could perform a full range of work, but (1) was limited to simple, repetitive, routine tasks requiring no more than occasional brief interaction with the general public, and (2) needed to avoid exposure to "heights, moving machinery and similar hazards." (Tr. 58.) The VE testified that the hypothetical worker could be employed as a dishwasher, laundry laborer, and packager. The VE further testified that there were 225,000 dishwasher jobs in the national economy, including 3,000 jobs in Oregon, 90,000 laundry laborer jobs in the national economy, including 800 jobs in Oregon, and 355,000 packager jobs in the national economy, including 4,000 jobs in Oregon. (Tr. 58.)

The ALJ next asked the VE about the customary tolerances of employers with respect to tardiness, absenteeism, break periods, and being off-task. The VE testified that tardiness is expected to "be kept to an absolute minimum," that unexcused or unscheduled absences cannot exceed more than one per month, that there are typically three break periods each day, ranging from ten to fifteen minutes (the morning and afternoon breaks) to thirty to sixty minutes (the lunch break), and that an employee would be terminated if they were off-task for more than ten percent of each workday. (Tr. 59.)

Morford's attorney also posed two questions to the VE. First, Morford's attorney asked the VE to assume that a hypothetical worker of Morford's age, education, and work experience "would have at least one [dizziness or faintness] episode during [each] workweek [that] would make this

Page 7 - OPINION AND ORDER

individual nonfunctional on an unpredictable basis for [thirty] to [sixty] minutes at a time." (Tr. 60.) The VE confirmed that such a limitation would preclude the hypothetical worker from sustaining gainful employment. Second, Morford's attorney asked the VE to assume that the hypothetical worker suffered from marked limitations in (1) maintaining attention and concentration for extended periods of time, (2) completing a normal workday and workweek without interruptions from psychological-based symptoms, (3) performing at a consistent pace without an unreasonable number of break periods, and (4) traveling to unfamiliar places or using public transportation. The VE stated that the first three limitations "alone or in any combination" would preclude gainful employment. (Tr. 61.)

In a written decision issued on January 7, 2014, the ALJ applied the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920(a)(4), and found that Morford was not disabled. *See infra* Part II.A-B. The Social Security Administration Appeals Council denied Morford's petition for review, making the ALJ's decision the Commissioner's final decision. Morford timely appealed to federal court.

## II. THE FIVE-STEP SEQUENTIAL PROCESS

### A.    Legal Standard

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

(1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

B.    **The ALJ's Decision**

At the first step of the sequential process, the ALJ found that Morford had not engaged in substantial gainful activity since April 26, 2012, the date she filed the application. At the second step, the ALJ found that Morford had the severe medically determinable impairments of borderline intellectual functioning, depression, anxiety, and "probable" schizoaffective and somatoform disorders. (Tr. 13.)

At the third step, the ALJ found that Morford's combination of impairments was not the equivalent of those on the Listing of Impairments.[6] The ALJ then assessed Morford's residual functional capacity ("RFC") and found that she could "perform a full range of work at all exertional levels," subject to the following limitations: (1) she would need to avoid exposure to heights, moving machinery, and similar hazards, (2) she would need to be limited to simple, repetitive, routine tasks, and (3) she would need to be limited to no more than occasional, brief interaction with the general public. (Tr. 15.)

At the fourth step, the ALJ concluded that Morford had no past relevant work experience.[7] At the fifth step, the ALJ concluded that there were other jobs existing in significant numbers in the national economy that Morford could perform, such as a dishwasher, laundry laborer, and hand packager. Accordingly, the ALJ concluded that Morford was not disabled, as defined under the Social Security Act, during the relevant time period.

### III. STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as

---

[6] The Listing of Impairments is found at 20 C.F.R. Part 404, Subpart P, Appendix 1, and described at 20 C.F.R. §§ 404.1525, 404.1526, 416.925, 416.926.

[7] The ALJ observed that Morford "has consistently worked, but never received earnings allowing her to meet the criteria of past relevant work[.]" (Tr. 32.)

adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Id.* However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## IV. DISCUSSION

In this appeal, Morford argues that the ALJ erred by failing to: (1) offer clear and convincing reasons for discrediting Dr. Spendal's opinion evidence; (2) include conversion disorder as a severe impairment at step two of the sequential analysis; (3) conclude at step three of the sequential analysis that Morford is presumptively disabled under listing 12.05C; and (4) account for the limitations resulting from Morford's "pseudoseizures" in formulating the RFC. As explained below, the Court concludes that the Commissioner's decision is free of legal error and supported by substantial evidence.

### A.    Medical Opinion Evidence

#### 1.    Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec.*

*Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (quoting *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2001)). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions, however, is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id*. at 1012-13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)).

## 2.    Application of Law to Fact

Morford argues that the ALJ failed to offer legally sufficient reasons for discounting Dr. Spendal's opinions, in particular her opinion that Morford could not sustain full-time work. The Court disagrees.

Dr. Spendal's opinions conflicted with those of the non-examining state agency medical consultants, none of whom opined that Morford would be unable to sustain full-time work. The ALJ was therefore required to provide specific and legitimate reasons for assigning limited weight to Dr. Spendal's opinions. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[I]n the case of a conflict 'the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.'"); *Killan v. Barnhart*, 226 F. App'x 666, 668 (9th Cir. 2007) ("Killian's contention that the ALJ erred when he discounted her treating physician's opinion is flawed because the treating physician's opinion conflicted with that of a nonexamining physician, and the ALJ supported his decision with specific and legitimate reasons."). The ALJ met that burden here.

The ALJ provided several specific and legitimate reasons for discounting Dr. Spendal's opinion. For example, the ALJ discounted Dr. Spendal's opinion because she failed to account for Morford's inconsistent reports in 2012. (Tr. 32); *see Townsend v. Astrue*, No. 6:12-cv-00261-SI, 2013 WL 687042, at *4 (D. Or. Feb. 25, 2013) (explaining that specific and legitimate reasons for rejecting a doctor's opinion include "inconsistency with a claimant's testimony"). In her consultative report, Dr. Spendal concluded that, if Morford worked more than ten hours a week, it "will likely lead to more [episodes of faintness]." (Tr. 617.) On January 18, 2012, however, Morford reported that she had not experienced any episodes of faintness since she started bi-weekly counseling with Vogelsang, and Dr. Lafrance noted that these episodes were under control.[8] (Tr. 516-17.) When Morford returned to Dr. Lafrance's office on February 29, 2012, Morford reported that she had not

---

[8] Morford did not begin individual counseling with Vogelsang until December 2011. (*See* Tr. 578-80.)

Page 13 - OPINION AND ORDER

experienced any episodes of faintness as a result of her counseling, and Dr. Lafrance noted that the

"[e]pisodes are in control - likely resolving conversion disorder." (Tr. 513-14.) Similarly, when

Morford visited Vogelsang's office on March 11, 2012, Morford reported that "she has had no

further fainting spells," which Morford attributed to "having someone to talk to about things," and

that she was "positive about having returned to work and enjoying the social aspect of this." (Tr.

582-83.) Although Morford reported that her spells of faintness had returned on June 8, 2012,

Morford had not attended counseling during the preceding three months: "[Morford] says she needs

to continue [individual counseling] at this time because she started having 'fainting' spells

again. . . . [Morford] has not seen her primary care physician since our last appointment three months

ago[.]" (Tr. 581.)

None of the records discussed above were made available to Dr. Spendal: "No records were

available from 2012; most recent therapy records were from December 2011." (Tr. 608.) That is

significant because Morford does not allege the onset of disability until April 26, 2012, and because

impairments that respond favorably to conservative treatment are not disabling. *See Gray v. Colvin*,

12-10915, 2013 WL 6241588, at *8 (C.D. Cal. Dec. 3, 2013) (stating that "responding favorably to

conservative treatment undermines claim of disabling symptoms") (citation omitted); *Fox v. Astrue*,

No. 9-06178-JE, 2011 WL 839186, at *3 (D. Or. Mar. 3, 2011) (noting that the plaintiff "responded

favorably to conservative treatment such as medication and counseling"). In light of the foregoing,

the Court concludes the ALJ did not err in discounting Dr. Spendal's opinion, because it failed to

account for reports by Morford in 2012 that her condition was controlled with counseling.

The ALJ also discounted Dr. Spendal's opinion on the ground that it was based largely on

Morford's self-reports, which the ALJ found to be incredible. "'An ALJ may reject a . . . physician's

Page 14 - OPINION AND ORDER

opinion if it is based to a large extent on a claimant's self-reports that have been properly discounted as incredible.'" *Burrell v. Colvin*, 775 F.3d 1133, 1140-41 (9th Cir. 2014) (quoting *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008)). Morford does not dispute on appeal whether her self-reports have been properly discounted as incredible; rather, she disputes only whether Dr. Spendal's opinion was based to a large extent on such reports. A review of the consultative report prepared by Dr. Spendal reveals that she administered a battery of tests to Morford, and reached conclusions based on the results of those tests. However, it also reveals that Dr. Spendal relied to a large extent on Morford's self-reports. For example, Morford informed Dr. Spendal that she did not believe she could work more than ten hours a week due to her impairments. (Tr. 605.) Dr. Spendal accepted that self-report, and made the following recommendation to the Social Security Administration: "The ten hours a week she works at K-Mart is likely to be the maximum of what she can handle. More work will likely lead to more seizures." (Tr. 617.) Dr. Spendal also necessarily relied on Morford's self-reports concerning her level of impairment in 2012, the year of alleged onset, because, as discussed above, Dr. Spendal was not provided copies of Morford's treatment or therapy records from 2012, which demonstrated that Morford's "seizures" were well controlled by counseling. The Court finds that the ALJ's conclusion that Dr. Spendal relied largely on Morford's self-reports is reasonable and supported by substantial evidence.

The ALJ also discounted Dr. Spendal's opinion based on observations from other medical providers that did not corroborate Dr. Spendal's opinions. Specific and legitimate reasons for rejecting a doctor's opinion include non-corroborating observations from other medical providers. *See Barnard v. Comm'r of Soc. Sec. Admin.*, 286 F. App'x 989, 991 (9th Cir. 2008) (affirming rejection of doctor's opinion under specific and legitimate reasons standard, and noting that the ALJ

pointed to, *inter alia*, "observations of two prior physicians that did not corroborate the doctor's conclusion"). The ALJ observed that Dr. Spendal "overlooks or was unaware" of findings from Dr. Sobotka and Vogelsang suggesting that Morford may be motivated by secondary gain. (Tr. 32.) Specifically, Vogelsang observed that "[s]econdary gains may be possible, [because Morford] is clearly deriving attention from family and co-workers." (Tr. 576.) Similarly, Dr. Sobotka, a treating psychiatrist, observed that Morford "does not perceive that there may be some secondary gain in the support and attention from these episodes or that such basic psychological needs may be better met by keeping her job." (Tr. 599.) The ALJ did not err in discounting Dr. Spendal's opinion on this ground. *See Moody v. Comm'r of Soc. Sec. Admin.*, No. 3:14-cv-01756-MA, 2015 WL 6948578, at *5 (D. Or. Nov. 10, 2015) (stating that the "plaintiff's motivation for secondary gain is a specific and legitimate reason, sufficient in and of itself to reject [the doctor's] opinion").

The ALJ also discounted Dr. Spendal's opinion in favor of, among other things, a conflicting opinion offered by Dr. Anderson, a non-examining state agency medical consultant. Unlike Dr. Spendal's opinions, the ALJ found Dr. Anderson's opinions to be the most accurate summary of Morford's credible symptoms. (Tr. 31.) Dr. Anderson's opinion, coupled with the reasons described above, constitutes the substantial evidence necessary to affirm the ALJ's rejection of Dr. Spendal's opinions. *See Cha Yang v. Comm'r of Soc. Sec. Admin.*, 488 F. App'x 203, 204 (9th Cir. 2012) ("[A]lthough a state agency physician's opinion, standing alone, cannot constitute substantial evidence, it can be substantial evidence when the ALJ points to other evidence as well.").

In sum, the Court concludes that the ALJ's rejection of Dr. Spendal's opinions was supported by substantial evidence and should not be disturbed on appeal. *Cf. Jackson v. Colvin*, No. 14-9935, 2016 WL 1273159, at *5 (C.D. Cal. Mar. 31, 2016) ("The ALJ needed only one specific and

legitimate reason to reject the opinion of an examining physician, and he gave one here—that Dr. Lee's opinion was based on Jackson's unreliable self-reporting.").

**B.      Step Two Severity Findings**

Morford argues that the ALJ erred by failing to find that her conversion disorder was a severe impairment at step two of the five-step sequential process. The Court finds that any such error was harmless. *See Mondragon v. Astrue*, 364 F. App'x 346, 348 (9th Cir. 2010) ("Any alleged error at step two was harmless because step two was decided in [claimant's] favor with regard to other ailments.") (citation omitted).

Morford suggests that failing to include conversion disorder as a severe impairment at step two became prejudicial at step four because the ALJ did not account for the fact that Morford's conversion disorder would cause her to have at least one pseudoseizure each workweek, which would render Morford "nonfunctional on an unpredictable basis" for thirty to sixty minutes at a time. (*See* Pl.'s Br. at 19-20.) The VE testified that such a limitation would prevent a hypothetical worker from sustaining gainful employment. (*Compare* Pl.'s Br. at 8, *with* Pl.'s Br. at 19, *and* Tr. 60.) However, "[a]n ALJ's RFC need only incorporate credible limitations supported by substantial evidence in the record and [it] must be consistent with the restrictions identified in the medical testimony." *Burke v. Comm'r of Soc. Sec.*, No. 13-1890-BR, 2015 WL 769951, at *5 (D. Or. Feb. 23, 2015). Morford has not pointed to any credible evidence indicating that her impairments would lead to weekly pseudoseizures that would render Morford nonfunctional on an unpredictable basis for thirty to sixty minutes at a time. The only evidence that would appear to support the degree of limitation advanced by Morford comes from her own self-reports: "[Morford] stated it takes her [thirty] to [sixty] minutes to recover from these [pseudoseizures]." (Tr. 605.) Morford does not

challenge the ALJ's conclusion that her self-reports are not credible. For all of these reasons, the Court finds that the ALJ's failure to include conversion disorder as a severe impairment at step two was harmless, and did not prejudice later steps of the sequential evaluation process.

**C.    Step Three Equivalence Determination**

Morford argues that the ALJ erred by failing to conclude at step three of the sequential analysis that Morford is presumptively disabled under listing 12.05C (intellectual disability). The Court disagrees.

To satisfy listing 12.05C, a claimant must establish: "(1) significantly subaverage general intellectual functioning with deficits in adaptive functioning with an onset before age [twenty-two]; (2) a valid verbal, performance, or full scale IQ of [sixty] to [seventy]; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Stavrakis v. Colvin*, No. 6:12-cv-1929-SI, 2014 WL 1584494, at *4 (D. Or. Apr. 21, 2014) (citation omitted).

The parties dispute only whether Morford has established that she suffered from significantly subaverage intellectual functioning with deficits in adaptive functioning with an onset before age twenty-two. "Although the Ninth Circuit has never addressed this issue, other circuits and district courts within the Ninth Circuit have presumed that a *valid adult* IQ score is evidence that the impairment existed during the claimant's developmental period." *Brooks v. Astrue*, No. 11-1252-SI, 2012 WL 4739533, at *5 (D. Or. Oct. 3, 2012) (emphasis added) (citation omitted). Some circuit courts "have adopted a *per se* rebuttable presumption of impairment during the developmental period when the claimant has presented evidence of a valid IQ score of 60 to 70," while others have required "the claimant to produce additional evidence that supports the finding of onset during the

developmental period." *Id.* (citing, *inter alia*, *Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001)). A number of the judges in this district have adopted the approach that "a valid adult IQ score can be reflective of an impairment that manifested during the claimant's developmental period." *Id.* at *6.

In the present case, Morford was given the Wechsler Adult Intelligence Scale, Fourth Edition, battery of tests. (Tr. 608.) Dr. Spendal's report indicates that Morford obtained a full-scale IQ score of seventy-one, a verbal comprehension score of eighty, a perceptual reasoning score of seventy-one, a processing speed score of eighty-one, and a working memory score of sixty-six. (Tr. 609.) Morford argues that her working memory score of sixty-six qualifies as "a valid verbal, performance, or full scale IQ score" within the sixty to seventy range, which, in turn, demonstrates that she suffered from significantly subaverage intellectual functioning with deficits in adaptive functioning and an onset before age twenty-two. This argument is unpersuasive. Morford's working memory score fails to satisfy Listing 12.05C, because that listing requires a verbal, performance, or full scale IQ of sixty through seventy. *See Flanigan v. Colvin*, 12-1706, 2013 WL 6243845, at *11 (E.D. Mo. Dec. 3, 2013) ("Flanigan's argument that her working memory score of [sixty-eight] on the Weschler Intelligence Test qualifies her under 112.05D and 12.05C is simply wrong, as the Listings require a 'verbal, performance, or full scale IQ of [sixty] through [seventy].' Flanigan received a full-scale score of [eighty], a verbal-comprehension score of [eighty-five], and a perceptual-reasoning index of [eighty-four], thereby excluding her from Listing 112.05D and 12.05C.")

Furthermore, the Ninth Circuit has held that an ALJ may discredit an IQ score in light of conflicting evidence. *Thresher v. Astrue*, 283 F. App'x 473, 475 (9th Cir. 2008). The ALJ in this case discounted the IQ scores derived from Dr. Spendal's examination:

Page 19 - OPINION AND ORDER

> The record . . . does not show that the claimant's condition meets or potentially equals the criteria of [listing] 12.05C. While the claimant has low IQ scores and a diagnosis of borderline intellectual functioning, . . . she also has a history of adaptive functioning far above that consistent with mild mental retardation. The record shows that the claimant attended college for four years, taking courses in criminal justice. She did not earn a degree, but she indicated that she felt she did well in her classes. In addition to continuing ongoing work activity, she also maintains fairly normal activities of daily life, including caring for a teenage child.

(Tr. 14.) The ALJ made a similar observation later in his written decision: "[The record] shows that despite her claims of low IQ, . . . [Morford] repeatedly, if not invariably, shows a normal or near-normal mental status examination[.]" (Tr. 18.) The ALJ added that Morford consistently maintained a balanced till while serving as a cashier at K-Mart, which further supports the ALJ's conclusion that Morford has a history of functioning that is inconsistent with a diagnosis of mild mental retardation. (Tr. 25, 581, "She is working at K-Mart, she is a cashier, 'I'm doing good, I haven't had a bad till yet.'") Accordingly, the Court finds that the ALJ provided legally sufficient reasons for his conclusion that Morford is not presumptively disabled under Listing 12.05C. *See Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 869, 872-73 (6th Cir. 2003) (noting that the claimant had a performance IQ score of 67, but nevertheless concluding that substantial evidence supported the ALJ's finding that the claimant failed to satisfy listing 12.05C, because no psychologist had concluded that the claimant suffered "significantly subaverage general intellectual function" or "deficits in adaptive functioning," and because the claimant's educational background and work experience demonstrated an "ability to perform relatively complicated tasks"); *see also Dragon*, 470 F. App'x at 462-63 ("The regulations permit the ALJ to question the validity of test results in conjunction with other factors. In assessing the validity of a claimant's I.Q., '[i]nformation from both

medical and nonmedical sources may be used to obtain detailed descriptions of the individual's activities of daily living'").

**D.      RFC Determination**

Morford also argues that the ALJ erred by failing to account for the limitations resulting from her "pseudoseizures" in formulating the RFC. For the reasons explained *supra* Part IV.B., the Court concludes that the RFC determination accounted for all of the credible limitations resulting from Morford's impairments.

**V. CONCLUSION**

For all the reasons stated herein, the Court affirms the Commissioner's denial of Morford's application.

IT IS SO ORDERED.

Dated this 1st day of June, 2016.

_____
STACIE F. BECKERMAN
United States Magistrate Judge

Page 21 - OPINION AND ORDER